I think I've had all these briefs from you, and I don't think I've ever heard you argue, or did I? You're going to tell me I did. Yes, you did, Your Honor. Okay. It must not have been very memorable for you. No, but I just have a bad memory. Good afternoon to the Court. My name is Abraham Walter. I represent the appellant, Daniel Creter, and I have asked, and I ask again for three minutes rebuttal time. Granted. Thank you very much. And you have all these immigration cases. Now, Your Honor, I'm going to reveal. I think it's important to remember that this case is an appeal of a cessation of benefits. It is not a new entitlement case, but it's a cessation. That being the case, the Commissioner has a double burden. The first burden is to show medical improvement that leads to the ability to work. The second burden in this particular case is that the denial or the upholding of the cessation occurred at the fifth step of the sequential evaluation when the burden is clearly on the Commissioner. So he has a double burden. In this case, it appeared that there was at least evidence that his fractures from this bad motorcycle accident had healed. Yeah. And that he had the atrophy that previously had existed appeared no longer to be there. So they go, they try to have the cessation at step five, which is, I guess, my biggest concern. The implication from your briefing is that these monitoring, surveillance monitoring positions could only exist for somebody who could do a computer. But I think that didn't the V.E. take that into account? Yes, Your Honor. Your Honor said a lot of things. May I respond? Sure. Go right ahead. First of all, respectfully, I disagree that his fractures had healed. They hadn't. They still haven't. He has two fractures in his hand that are not only not healed, but they have malunion. What about the leg? And in the leg, in February of 93, he was awarded re-benefit for the first time. And in September of 1993, he had to have another surgery on the hip because the hardware had failed and the fracture line was still there. And they put putty and particles inside of his hip joint. And he needs another surgery to remove some hardware or readjust some hardware. And that persists today. Now, with regard to the location... Well, that's a factual issue that was decided against your client by the agency, right? I don't believe so, Your Honor. I don't believe that they found that these fractures had disappeared. The atrophy can't disappear. I understand the DALJ said, or Dr. Schwartz... But are you saying we should never have reached step five? I don't understand, Your Honor. Are you saying that the injuries were so bad that under step three, for example, he should have been listed? I don't remember reading that in the brief.  So that gives us the four and five, right? Yes, we are at four and five. And he can't do four, and so we get to five. And that's where we are. And I'm happy being there. The point that I tried to make was that there's no indication that the fractures have resolved. They certainly haven't resolved in the hand, and it's up in the air. Step five is, given his current condition, is there any job in the national economy that he can do? Yes, they identified one job. By the way, the hand is his non-dominant hand, right? Correct. Absolutely correct. Again, the point of arguing about medical is twofold. Number one, the medical produces the pain. This is a pain case because the pain was rejected. His pain does not affect him and does not affect his concentration. Everyone says that he's in chronic pain. Even Dr. Schwartz, who was the consultant who examined him in order to seize benefits, said, well, he's in pain, but when they take the hardware out, he'll be fine. They haven't taken the hardware out. Well, he hasn't let them, has he? He has no choice, Your Honor. I understand that there is, again, you have to argue the facts that you have, and the commissioner has argued as to the decision. Well, he skipped a lot of clinic appointments, but it's an irrelevant factor. If he had gone to the clinic, he might have less pain. I don't know how, Your Honor. The point is, if he's in such pain, what's he taking for it? He doesn't see a doctor. He doesn't have any meditation. They cut him off. He was on medication. But I took Tylenol this morning for pain. I mean, you can take things. She was going to be with me today, so she took Tylenol. I think more appropriately, she was going to be with me today. But, you know, there are things you can take for pain. Your Honor, with all due respect, you don't have two non-union fractures in your hand, and you do not have a hip that is never going to get better, and you do not walk with a straight cane, and you don't have failed hardware in your hip. So, yes, and he does take Tylenol, by the way, and Aleve. He just doesn't take prescription medication. The point of the matter is that in order for the commissioner to make this determination of medical improvement, the first thing they have to do is go through the comparison point decision, the CPD, they call it. They don't even have the comparison point decision. They don't know what was found last time. So, sure, we have medical, okay, but that medical is not obvious in the least, and a very good argument can be made. As a matter of fact, it was made in the— I thought that the ALJ here found that there had been an improvement in condition, as I noted to you at the outset, such that we easily can't get to Step 5, and I thought your response ultimately was, I'm happy to be in Step 5. I am. And the ALJ credited his argument that he's in constant pain. The ALJ didn't discredit that argument, but he concluded that despite any pain he felt, he was capable of a sedentary job with occasional fine or gross manipulation by his non-dominant right hand. Yes, Your Honor, if the claim is— So if you're arguing to us he's in pain, I mean, the ALJ took that into consideration. He certainly didn't. Well— He certainly didn't, because his hypothetical to the vocational expert did not include constant pain, number one. Number two, the ALJ found that his pain was not credible. It did not affect his concentration because he could play checkers with his friend. The fact of the matter is— Can I just ask, it said the ALJ also questioned Dr. Feinstein about the impact on vocational opportunities for a person who could sit for no more than 10 to 15 minutes at a time or who can maintain attention and concentration for no more than half an hour at a time. If he included those hypotheticals, doesn't that include the idea that his problem is pain? Absolutely, and Dr. Feinstein said he couldn't work under that hypothetical, so that the hypothetical in the decision was changed. He asked three hypotheticals. The question is, he could ask 11 hypotheticals. He could ask hypotheticals all day. Which one is he going to choose for the decision? I thought that Dr. Feinstein said that with those additions to the hypothetical, that it might affect his ability to perform the job, but there was still his ability to monitor a surveillance station. No, Your Honor. I got that wrong? Well, with all due respect, yes, the first hypothetical was he could do sedentary work and he has some manipulative problem in the effective hand. He found the jobs. Then he said, well, if the pain interfered with his concentration, would he be able to do it? No. If he could only sit for 15 minutes? No. If he could only sit for a half an hour? Mostly not, probably not. When my partner cross-examined the vocational expert, we got rid of the first two jobs easily because they involved the computer. We then come to our favorite job in social security world, a job that can be done with a person with one finger and one eye, the surveillance monitor job. Now, it was clear that the vocational expert did not know a lot about that job. He even admitted his knowledge was general, which means the same knowledge that this court has. You've seen people looking at monitors. Now, on cross-examination, he admitted he had only seen it once in the New York State office building. He said it was consistent with the dictionary of occupational titles. In my brief, I tried to show the court that the dictionary of occupational titles classifies this job as a government job in basically police work in Penn Station, which has nothing to do with a reality because the surveillance monitor job has grown since 1991 when the dictionary of occupational titles was published. But rather, the vocational expert didn't know anything about this job, knew nothing. Is he able to do a private surveillance monitoring? You say no. Certainly not, and there's no evidence that he can, Your Honor. There's no evidence because the vocational expert doesn't know anything about this job. We asked him, do you need a computer? Well, yeah. He eliminated computers from the... He eliminated 2,500 out of the 6,500. So he said there were 4,000 jobs that did not require... Where did he get the number from? He admitted he only had general knowledge of the job itself, number one, and number two, he admitted he'd only seen it once in the New York State office building. That's it. That's what he knows about this job. His original answers to the ALJ also showed that the vocational expert didn't know a lot about those jobs because he said the appellant could do the food service job. He could do the information clerk job. And then when my partner, of course, examined me, he said, well, yeah, you do need a computer. Yeah, you do need a computer. And there's no evidence that my client knows how to use a computer. He's completely unskilled. That would be an unskilled job. He was asking about unskilled jobs. My client doesn't have any skills. And he gave us skilled jobs. So the vocational expert... Well, surveillance monitors are not a skilled job. Yeah, you use a computer, it's not a skilled job. But we've eliminated those. But on what basis, Your Honor? On what basis? Because you wanted them eliminated, I think. It looks like what they did was they maybe just kept, you know, you did an effective job. They whittled away this, they whittled away the second thing, they whittled away the third, and on the fourth, the last one, the surveillance monitor, they whittled away those who used computers. But still there were jobs that he could do. Yes, Your Honor. That's what the vocational expert said.  Now, I remind the court again, the burden is on the commissioner. On what basis did the vocational expert say or prove or even suggest that you could take 2,500 out of the 6,500 jobs out on the basis of a computer? On what basis? No basis. There is no numbers. There are no learning texts. The only thing he referred to was the Dictionary of Occupational Titles, which does not have that job in the manner in which he says it does. My time, unfortunately, is up. Thank you. Thank you. We'll hear from the Social Security Administration. And you have a bottle you've reserved. Please, the court, my name is Andrea Lechlechner, and I represent the commissioner. Let me ask you just where we left off. It appears that the commissioner may have not been able, at step five, there may be a discrepancy between the DOT information and the vocational expert testimony. Your Honor, if there is a discrepancy, the discrepancy is minor. Under Roetheford, this court has held that minor discrepancies do not warrant a remand. It's only when the discrepancies are egregious. Here, the vocational expert identified the job, explained how it is done. He said that it's done in a sedentary position that involves looking at monitors, that it involves pulling toggle switches, and that description is very similar to the DOT description of the job. The only minor discrepancy that even exists is where the job is performed. And the vocational expert testified, yes, it is performed in federal buildings, but in addition to that, it's performed in other places as well, such as corporate buildings, malls, et cetera. But to do his job, what was the evidence that he had the ability to concentrate for extended periods of time? Well, there was no evidence that he didn't have the ability to concentrate. Certainly, he was able to play chess and uno, as the ALJ had found. The ALJ looked at the evidence in its entirety and found that the only limitation that the appellant had had was that he was limited to sedentary work and he could not do more than occasional manipulative limitations with his right non-dominant hand. And so in making this finding, the ALJ looked at the medical evidence, the opinion of Dr. Schwartz. The only limitation Dr. Schwartz had noted was that because of the dominant hand, not the left leg fracture, but because of the problem with the non-dominant hand, the appellant would not be able to lift heavy weights. But did the ALJ make a determination that he's lost none of his ability to concentrate? No. The ALJ did not find that the appellant had a limitation in concentration. That is correct. He looked at the evidence in its entirety and he did not find a limitation with respect to concentration. So he found that, in effect, that he had lost none of his ability to concentrate. Is that correct? That's correct. But you said you didn't put any, just a moment ago, you didn't put any evidence in as to whether he had indeed lost the ability to concentrate. If you didn't put any evidence in, how can the ALJ make that finding? Well, the ALJ looked at the evidence in the record from the physician that examined the claimant. The ALJ considered the fact that the appellant missed several appointments, stopped getting treatment, was only taking Tylenol and Aleve every now and then, and that's a quote from the record, that he was independent in his activities of daily living, according to his statement to Dr. Veknes. So based on everything that's in the record, the only limitations that were found were with respect to his ability to do not more than sedentary work and to have, and with his, and that is he had a manipulative limitation. He could not use his non-dominant hand more than occasionally. But there was no evidence that he had any difficulty concentrating. And the ALJ did actually cite in his decision to appellant's own statement that he did play chess or checkers. But if you're willing to have us, go ahead. I just wanted to say chess requires more concentration than checkers. I know for sure it was uno. I can't remember for certain if it was chess or checkers. All right, go ahead. If you have the, you're trying to have a cessation of disability benefits, what extra burden is on the commissioner to do that? Well, the commissioner has to show that by substantial evidence that there was a medical improvement and that the improvement related to the claimant's ability to work, meaning that there was an increase in his residual functional capacity. So before he wasn't able to do sedentary work, and now he was able to do so. So that, and at step five of the sequential evaluation process, the burden is on the commissioner to show that there are other jobs that the claimant can do. And here there's, according to the regulations, and I'm looking at 404, 1566, the commissioner must show only one job, and here he has done so with the Surveillance System Monitor position. When I looked at page 252 of the record, it looks as if after the cross-examination was finished, there seemed to be agreement by the DE that he needed to be able to concentrate for at least an hour to do this job. Is that right? Is that how you read it? First he says a half an hour. If he can concentrate for half an hour, that'll do. But then he seems to withdraw that, and it seems to be an hour. He has to be able to concentrate for at least an hour to do the job. 252 to 253, is that right? Have I got the right people here? There's one where it says answer. It sounds like an A. Yes, I believe that all require consistent concentration to a certain extent, and I don't think you'd be able to perform the jobs. And then the next question is about an hour, and the answer is if there's an hour with a five-minute stretch, I think it sounds basically, I think it might be difficult, but it sounds an hour, the V.E. finally says. I'm a little confused about the notations there. It uses Q&A and then it uses V.E. and attorney and ALJ. But isn't that what the V.E. says? It's basically around an hour. Yes, that seems to be correct. So the question is you're saying that the ALJ decided that he could concentrate for at least about an hour. Correct. And he did that when he said he could play checkers. Well, he did more than that. He looked at the record as a whole and found that there was no evidence that the appellant had trouble concentrating. There was no evidence based on the opinion and report and findings of Dr. Schwartz. The opinion and findings of Dr. Vecnas. It's important to note that a state agency physician looked at the record and mentioned no such limitations. The ALJ considered the non-medical evidence, the fact that the appellant was not seeking treatment, was taking medication every now and then. So looking at everything, all the records together is what the ALJ did and concluded, that there was no limitation in his ability to concentrate. Could you tell me about a fact? Mr. Alter said that he had atropine. But according to my notes, the ALJ noted that Prater's 1995 and 1996 medical evaluations, in contrast to his 1992 evaluations, showed excellent healing of the femoral fracture, no atrophying. That's correct. Is that right? That's correct. Both Dr. Schwartz and Dr. Vecnas, who are the examiners that you just referred to, found that there was no atrophy. So whatever atrophy existed in 92 wasn't there in 96. Correct. It's clear from the record that the appellant had improved. Dr. Schwartz's examination findings support that. Those of Dr. Vecnas. Even the X-ray evidence shows that after his second surgery, which took place in September of 93, he had new bone formation, and the X-rays progressively show that the fracture was healing, healing, healing, and finally it healed. This is leg we're talking about. I'm sorry? You're talking about leg. Yes, I am. When Mr. Crater was on getting benefits, he declined to undergo surgery on his wrist, even though he was informed that it may reduce his pain, when he was getting benefits. Isn't that right? That's right. That's correct. And, in fact, I just wanted to address my adversary's argument that the claimant didn't get medical treatment because he was cut off benefits, he had no money. Well, in fact, if you look at page 59, he elected to have his benefits continued, not to have his Medicare continued, but his other benefits, Social Security benefits, continued. So it appears that he made that request. Thank you. Do you have any more questions? Thank you. Thank you. Three things, please. Number one, Judge Restani was going over the VE's testimony with my colleague and talked about he has to be able to concentrate at least an hour, or was it half an hour? On the cross-examination, the vocational experts said he had to be able to concentrate constantly in order to perform this job, more so than in any other job. What page are you looking at? I just had it before I got up. It is 276. Talking about all the screens that this person would have to be looking at and what he's looking for in the middle of the page. Exactly. So it would take constant attention. 277? 276. Okay. Thank you. In the beginning, it says if he couldn't concentrate consistently, that would have a negative effect on his ability to do the job? Yes. Then you would need to be attending the screen because whatever's happening could happen momentarily, says the VE. My partner says, exactly. So it would take constant attention. Yeah. In that whereas other jobs, you could possibly get away with a five-minute break, et cetera, but then the world wouldn't come to an end. No, no, I would say that's true. So this job, more than any other job, theoretically, needs more concentration than anything else. That is a major discrepancy, especially in light of the fact that the ALJ found absolutely no concentration deficits. We want to talk about atrophy. We want to talk about the bone was healing very, very nicely in 1991 and 1992. Yeah, let's talk about atrophy. You told us when you got up that he had atrophy, and yet when I checked it, I noticed that the medical records said no atrophy. Your Honor, in the later examinations by Social Security, they found no atrophy. However, in an MRI on page 140, this is after. It's not going to say atrophy, so don't get too excited about it. I don't get excited about it at all. After all of these things, it was healing very well, new bone growth. In 1993, after all of those reports that my colleague referred to in 1991 and 1992, he still had a non-union fracture with intermedullary rod. What was the date of that MRI? 9-24-93. But the point is by 96, it looks like there was significant improvement. But, Your Honor, even those who examined him on behalf of the commissioner said he was in constant or chronic pain. One sits on his hips, Your Honor. That's what you said. I know I could make a joke about where you actually sit. But you sit using your hips. He found he could sit for six hours. The claimant said he could only sit for half an hour. And that he was in constant pain.